UNITED STATES BANKRUPTCY COURT
EASTERN DIVISION, DISTRICT OF MASSACHUSETTS

| IN RE | |
|---|---|
| Alexander V. Brown | Chapter 13<br>Case No. 07-12746-JNF |
| Debtor | |

DEBTOR'S MEMORANDUM IN OPPOSITION TO MOTION OF DEUTSCHE BANK
FOR RELIEF FROM ORDER VACATING
ORDER GRANTING RELIEF FROM STAY

NOW COMES Alexander V. Brown, debtor, and submits the following in opposition to the motion of Deutsche Bank for relief from the order which granted Brown's motion to vacate the order granting Deutsche Bank relief from the automatic stay.

ARGUMENT

In its order docketed on July 31, the court directed Deutsche Bank to submit a brief that addressed the following issues: (1) whether the debtor's right to object to deutsche bank's standing to assert its motion for relief from stay (the "motion") can be waived and, if so, whether it was waived by the debtor when he consented to the allowance of motion on 10/4/08; and (2) whether the debtor can be estopped from objecting to deutsche bank's standing due to such prior consent. The court also stated that the debtor may file a response by August 5.

In its brief, Deutsche Bank "concedes that the jurisdictional matter of standing cannot be waived by the parties." It goes on to admit, quite candidly, that Brown never waived the issue of standing. Nonetheless, it argues that Brown should be collaterally estopped from raising it now because he assented to entry of an order granting relief from the automatic stay. In support of that proposition, Deutsche Bank relies on Judge Rosenthal's decision in In re Nardone, 2008 WL 2705524 (Bkrtcy.D.Mass. 2008). Nardone is not at all persuasive as to the issues in this case because the type of waiver and collateral estoppel at issue in Nardone were completely different.

The issue before the Court in Nardone was whether a pre-bankruptcy waiver of discharge was enforceable. The context was an Adversary Proceeding in which the plaintiffs were seeking a declaration that a debt to them was non-dischargeable pursuant to 11 USC §523. Prior to the bankruptcy case, the defendant debtor had entered into an Agreement for Judgment in a civil action in Essex Superior Court. On reading the portion of the agreement quoted in the decision, it is abundantly clear that the parties in the state court action contemplated the possibility of bankruptcy and explicitly provided in the Agreement that the judgment would not be dischargeable. Judge Rosenthal did not find the debtor credible when the debtor testified that he

1

did not understand the Agreement, but signed it anyway in order to stop the state court litigation.

Early on in the Nardone litigation, Judge Somma had held, in essence, that a debtor may not waive the right to contest dischargeability. Consequently, the only issue before Judge Rosenthal was whether the Agreement for Judgment could be the basis for collateral estoppel against the debtor as to the facts of the dischargeability issue. Judge Rosenthal analyzed the elements of collateral estoppel, *citing, inter alia*, Grogan v. Garner, 498 U.S. 279 (1991), and found that the Agreement for Judgment did form such a basis. Accordingly, judgment was entered finding the debt owed to the plaintiffs to be non-dischargeable.

Given Deutsche Bank's concession that the issue of standing cannot be waived, the court lacks subject matter jurisdiction to consider the estoppel question, Christopher v. Stanley-Bostitch, Inc., 240 F.3d 95 (1st Cir. 2001); *see generally* Mills v. Harmon Law Offices, P.C., 344 F.3d 42 (1st Cir. 2003) (citing Christopher), because Deutsche Bank's standing has been questioned and never conceded, and in fact is in substantial doubt for the reasons set forth in Adversary Proceeding number 08-01191. Purported holders of mortgages must demonstrate that they actually hold the mortgage before they have standing to request relief from the automatic stay. In re Nosek, 386 BR 374 (Bkrtcy.D.Mass. 2008). Lacking standing, their requests for relief must be denied. *Cf.* In re Foreclosure Cases, 2007 WL 3232430 (N.D.Ohio 2007) (dismissing foreclosure complaints for failure to demonstrate standing). Here, Deutsche Bank has failed to demonstrate that it has standing because it has failed to demonstrate, conclusively, that it owns the mortgage at issue. The present motion must be denied.

Should this court nonetheless reach the estoppel question, there are four elements that Deutsche Bank must prove, as it admits. Because the issue of standing, i.e., Deutsche Bank's ownership of the mortgage, was not actually litigated, collateral estoppel does not apply. In Grella v. Salem Five Cent Savings, 42 F.3d 26 (1st Cir. 1994), the court made it abundantly clear that the only issue litigated on a motion for relief from the automatic stay is whether the moving party has shown a "colorable" right to possession of the property. While the bankruptcy court may *consider* defenses, the court does not render judgment as to such issues.

In an effort to circumvent this unambiguous holding, Deutsche Bank comments: "The world has evolved since Grella and the reality of mortgage securitization whether welcomed or not [sic] has precipitated more litigation over the rightful party in interest/holder in the context of a motion for relief hearing than may have taken place when Grella was decided." It is difficult to argue against the proposition that the world is a difference place in 2008 as compared to 1994. This is beside the point, however. The automatic stay provisions of the Bankruptcy Code have not been amended to change the nature of hearings under §362(d). Thus Deutsche Bank's implicit argument that the basic legal principles underlying Grella are no longer valid is meritless, if not frivolous. The only issue actually litigated on a motion for relief from stay is whether the moving party has a "colorable" right to possession of the property.

2

To the extent that putative defenses are actually litigated, the court applies a standard similar to that applied to preliminary injunctions; that is, the court determines whether the plaintiff (or, in the present context, the debtor) has demonstrated a reasonable likelihood of prevailing, but nonetheless does not reach a binding judgment. In re Noyes, 382 BR 561 (Bkrtcy.D.Mass. 2008). In Noyes, the debtor asserted various state law statutory and common law causes of action against her mortgagee in litigation commenced in state court. The mortgagee sought relief from the automatic stay. After a preliminary hearing, the court found cause to continue the stay pending a final evidentiary hearing. In granting relief from the stay, the court found that there was a real question about whether the transaction was bona fide. The court nonetheless found that there was insufficient evidence to defeat the mortgagee's "colorable" right to possession of the property.

In the present case, the debtor has not the debtor has not yet raised issues relating to the circumstances of the granting of the mortgage, but reserves the right to do so after discovery. Unlike the mortgage in Noyes, the mortgage in this case was given for the purchase of the property, not refinancing. Thus the issue presently before the court is more basic, i.e., whether Deutsche Bank is the owner of the mortgage and has standing to seek relief from the automatic stay.

In its memorandum, Deutsche Bank asserts that it is "ready, willing and able to demonstrate that it has standing." It then goes on to discuss the complaint in the Adversary Proceeding, stating that it "is founded on a poorly researched and baseless set of factual assertions." It is unclear what this has to do with collateral estoppel since none of these issues were "actually litigated", but since counsel for Deutsche Bank argued it, debtor's counsel feels compelled to respond because of his ethical obligation to represent his client zealously.

Deutsche Bank first attempts to rebut the statement in the complaint that Argent Mortgage Company is a stranger to the Pooling and Servicing Agreement. It acknowledges that the pool of loans to be conveyed to the trust were originated by Argent Mortgage Company, and that the *depositor* (which roughly equates to the "donor" in ordinary trust parlance) is Ameriquest Mortgage Securities, Inc. In a massive leap of logic, counsel for Deutsche Bank then concludes that the originator, Argent, somehow may convey mortgage loans directly to the trust, completely by-passing the depositor[1].

This misunderstands the function and legal significance of a Pooling and Servicing Agreement. Shorn of the legal verbosity, such agreements essentially are purchase and sale agreements. Exhibit D to Deutsche Bank's brief makes this apparent. Page two of that exhibit

---

[1] At the bottom of page 8 and continuing to page 9 of the brief, counsel for Deutsche Bank states: "The Debtor's further assertion by inference in paragraph 73 of the Complaint must be made via the depositor (Ameriquest Mortgage Securities, Inc.) is unfounded for the same reason." Although the sentence is garbled, it appears to mean that the debtor is incorrect in his assertion that deposits into the trust must be made by the depositor, for the same reason as was previously given. Debtor's counsel is mystified as to what the previously given reason is.

3

states that the parties to the agreement are Ameriquest Mortgage Securities, Inc., as depositor; Ameriquest Mortgage Company, as Master Servicer; and Deutsche Bank National Trust Company as Trustee. In other words, Ameriquest Mortgage Securities, Inc., agrees to establish a trust and deposit (i.e., convey) a pool of mortgages to the trust. Ameriquest Mortgage Company agrees to "service" the loans, i.e., to collect payments from the mortgagors. Deutsche Bank agrees to act as trustee of the trust. Presumably there is consideration flowing among the parties to the Agreement, as it confounds logic and common sense to believe otherwise.

Argent Mortgage Company is not named as a party to the agreement, and thus is a "stranger" to the agreement, as alleged in the adversary complaint. The conveyancing rules of the trust, which counsel for Deutsche Bank conveniently did not provide to the court but are attached hereto (beginning at section 2.01), make it clear that for a mortgage loan to be part of the pool, there must be a complete chain of title from the originator to the depositor, not directly to the trust.

Because the trust will be selling shares, such trusts are closely regulated by the Securities and Exchange Commission. As a result, there must be strict compliance with the terms and conditions of the Agreement establishing the trust, including the aforementioned conveyancing rules. Even if the debtor's mortgage was intended to be included in the pool (which is not conclusively established), the <u>depositor</u> must own it at some point before it can be conveyed to the trust. Bypassing the depositor would seem to be a violation of securities laws, at a minimum.

In attempting to show that CitiResidential has a valid Power of Attorney on behalf of Argent Mortgage, counsel for Deutsche Bank makes the curious statement that Citi has the authority "to execute substitutions of trustee or what we more commonly refer to in this jurisdiction as 'assignments of mortgage'", brief at page 9. In all honesty, debtor's counsel cannot decipher the meaning of this phrase as he cannot discern a connection between "substitutions of trustee" and "assignments of mortgage", and he has never referred to these documents in that manner nor heard anyone else refer to them in that manner. An "assignment of mortgage" is a document purporting to evidence conveyance of ownership of the mortgage from one party to another; it does not effect the substitution of one trustee for another[2]. In the present case, the purported assignment is from Argent Mortgage Company, which was never a "trustee" within the meaning of Massachusetts law, to Deutsche Bank as trustee of a securitized trust. There is no logical basis for an assertion that the assignment merely substituted Deutsche Bank for Argent. Thus, even assuming that CitiResidential has such authority, which is not

---

[2] This may relate to the assertion that in other states, a mortgage is called a "deed of trust" and presumably the mortgagee is called a "trustee". Assuming this to be true, it still does not explain how Argent and Deutsche Bank can by-pass the legal requirement that the *depositor* own the mortgage before it can be conveyed to the securitized trust. In Massachusetts, a mortgage is a legal interest in land and therefore must be in writing. Thus for Deutsche Bank to have valid title to the mortgage, there must be an assignment from Argent Mortgage Company to Ameriquest Securities and thence to Deutsche Bank.

4

admitted, that has no application to the validity of the assignment.

Deutsche Bank also complains that the debtor's objection to its claim is untimely within the meaning of the Local Rules. Pursuant to 11 USC §502(j) and Fed.R.Bankr.Pro. 3008, the court may reconsider allowance or disallowance of a claim "for cause". There is no explicit time limit in the statute or federal rule, meaning that the consideration of whether "cause" exists is an equitable one. The debtor respectfully suggests that having raised a legitimate question as to whether Deutsche Bank has standing to even file the claim in the first place, abundant cause exists for reconsideration.

As a last ditch effort to obtain relief to which it is not entitled, Deutsche Bank presents arguments concerning the debtor's plan. It is true that the court denied confirmation, however, the debtor has appealed from denial and the Bankruptcy Appellate Panel has granted leave to appeal. As a result, this court lacks jurisdiction to enter orders relating to or resulting from denial of confirmation. *Cf.* In re Muessel, 292 BR 712 (1st Cir. BAP 2003) (bankruptcy court lacked jurisdiction to dismiss case for failure to make plan payments while order denying confirmation was on appeal). Issues relating to the content or confirmability of a plan are not properly before this court and cannot be a part of any decision to grant or deny relief from the automatic stay.

### CONCLUSION

Deutsche Bank has stated that it is ready, willing and able to demonstrate standing. Until it does so, it is not entitled to relief from the automatic stay. Since the issue is squarely presented in the Adversary Proceeding and because a motion for relief from stay does not necessarily *conclusively* determine the issue of standing, the motion to vacate the order which reinstated the automatic stay should be denied in deference to the more appropriate procedural mechanism of the adversary proceeding.

August 5, 2008

Respectfully submitted,
Alexander Brown
By debtor's attorney,


/s/        *David G. Baker*
David G. Baker, Esq.
236 Huntington Avenue, Ste. 302
Boston, MA  02115
617-340-3680
BBO# 634889

5

Certificate of Service

The undersigned states upon information and belief that the within paper was served upon the entities named below by the court's CM/ECF system.


/s/          *David G. Baker*
David G. Baker


Carolyn Bankowski-13     13trustee@ch13boston.com

Adam B. Finkel on behalf of Ameriquest Funding II, LLC     bankruptcy@kordeassoc.com

John Fitzgerald     USTPRegion01.BO.ECF@USDOJ.GOV

Victor Manougian on behalf of Ameriquest Funding II, LLC     bankruptcy@kordeassoc.com

Julie Taylor Moran on behalf of Sovereign Bank     bankruptcy@orlansmoran.com

Dolores O'Neill on behalf of Massachusetts Department of Revenue, Child Support Enforcement Division     oneilld@dor.state.ma.us, davisc@dor.state.ma.us

Julie A. Ranieri on behalf of Ameriquest Funding II, LLC     bankruptcy@kordeassoc.com

Meghan Elizabeth Roche on behalf of Sovereign Bank     bankruptcy@orlansmoran.com

For purposes of calculating the amount of Accrued Certificate Interest and the amount of the Interest Distribution Amount for the Class A Certificates, the Mezzanine Certificates and the Class CE Certificates for any Distribution Date, the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Master Servicer pursuant to Section 4.03(e)) and any Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated first, to reduce the interest accrued on the Class CE Certificates, based on, and to the extent of, one month's interest at the applicable Pass-Through Rate on the Notional Amount of such Certificates, and thereafter, among the Class A Certificates and the Mezzanine Certificates on a *pro rata* basis based on, and to the extent of, one month's interest at the then applicable respective Pass-Through Rates on the respective Certificate Principal Balances of each such Certificate.

For purposes of calculating the amount of Uncertificated Interest for the REMIC I Group I Regular Interests for any Distribution Date, the aggregate amount of any Prepayment Interest Shortfalls, (to the extent not covered by payments by the Master Servicer pursuant to Section 4.03(e)) and any Relief Act Interest Shortfalls incurred in respect of Loan Group I shall be allocated first, to REMIC I Regular Interest I and to the REMIC I Group I Regular Interests ending with the designation "B", *pro rata* based on, and to the extent of, one month's interest at the then applicable respective REMIC I Remittance Rates on the respective Uncertificated Principal Balances of each such REMIC I Regular Interest, and then, to REMIC I Group I Regular Interests ending with the designation "A", *pro rata* based on, and to the extent of, one month's interest at the then applicable respective REMIC I Remittance Rates on the respective Uncertificated Principal Balances of each such REMIC I Regular Interest. For purposes of calculating the amount of Uncertificated Interest for the REMIC I Group II Regular Interests for any Distribution Date, the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Master Servicer pursuant to Section 4.03(e)) and any Relief Act Interest Shortfalls incurred in respect of Loan Group II shall be allocated first, to REMIC I Regular Interest II and to the REMIC I Group II Regular Interests ending with the designation "B", *pro rata* based on, and to the extent of, one month's interest at the then applicable respective REMIC I Remittance Rates on the respective Uncertificated Principal Balances of each such REMIC I Regular Interest, and then, to REMIC I Group II Regular Interests ending with the designation "A", *pro rata* based on, and to the extent of, one month's interest at the then applicable respective REMIC I Remittance Rates on the respective Uncertificated Principal Balances of each such REMIC I Regular Interest.

For purposes of calculating the amount of Uncertificated Interest for the REMIC II Regular Interests for any Distribution Date:

(i)        50% of the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Master Servicer pursuant to Section 4.03(e)) and 50% of any Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated among REMIC II Regular Interest II-LTA1, REMIC II Regular Interest II-LTA2A, REMIC II Regular Interest II-LTA2B, REMIC II Regular Interest II-LTA2C, REMIC II Regular Interest II-LTA2D, REMIC II Regular Interest II-LTM1, REMIC II Regular Interest II-LTM2, REMIC II Regular Interest II-LTM3, REMIC II Regular Interest II-LTM4, REMIC II Regular Interest II-LTM5, REMIC II Regular Interest II-LTM6, REMIC II Regular Interest II-LTM7, REMIC II Regular Interest II-LTM8, REMIC II Regular Interest II-LTM9, REMIC II Regular Interest II-LTM10 and REMIC II Regular Interest II-LTZZ, on a *pro rata* basis, based on, and to the extent of, one month's interest at the then applicable respective REMIC II Remittance Rates on the respective Uncertificated Balances of each such REMIC II Regular Interest; and

(ii)        50% of the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Master Servicer pursuant to Section 4.03(e)) and 50% of any Relief Act Interest Shortfalls incurred in respect of the Mortgage Loans for any Distribution Date shall be allocated to Uncertificated Interest payable to REMIC II Regular Interest II-LT1SUB, REMIC II Regular Interest II-LT1GRP, REMIC II Regular Interest II-LT2SUB, REMIC II Regular Interest II-LT2GRP and REMIC II Regular Interest II-LTXX, on a *pro rata* basis, based on, and to the extent of, one month's interest at the then applicable respective REMIC II Remittance Rates on the respective Uncertificated Balances of each such REMIC II Regular Interest.

SECTION 1.03.  Rights of the NIMS Insurer.

Each of the rights of the NIMS Insurer set forth in this Agreement shall exist so long as (i) the NIMS Insurer has undertaken to guarantee certain payments of notes issued pursuant to an Indenture and (ii) any series of notes issued pursuant to one or more Indentures remain outstanding or the NIMS Insurer is owed amounts in respect of its guarantee of payment on such notes; provided, however, that the NIMS Insurer shall not have any rights hereunder (except pursuant to Section 11.01 in the case of clause (ii) below) during the period of time, if any, that (i) the NIMS Insurer has not undertaken to guarantee certain payments of notes issued pursuant to the Indenture or (ii) any default has occurred and is continuing under the insurance policy issued by the NIMS Insurer with respect to such notes.

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;
ORIGINAL ISSUANCE OF CERTIFICATES

SECTION 2.01.  Conveyance of Mortgage Loans.

The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Mortgage Loans identified on the Mortgage Loan Schedule, the rights of the Depositor under the Mortgage Loan Purchase Agreement, all other assets included or to be included in REMIC I, payments made to the Trustee by the Swap Administrator under the Swap Administration Agreement and the Swap Account. Such assignment includes all interest and principal received by the Depositor or the Master Servicer on or with respect to the Mortgage Loans (other than payments of principal and interest due on such Mortgage Loans on or before the Cut-off Date). The Depositor herewith delivers to the Trustee an executed copy of the Mortgage Loan Purchase Agreement and the PMI Policy, and the Trustee, on behalf of the Certificateholders, acknowledges receipt of the same.

In connection with such transfer and assignment, the Depositor does hereby deliver to, and deposit with, the Trustee the following documents or instruments with respect to each Mortgage Loan so transferred and assigned, and the Depositor shall deliver or cause to be delivered to the Custodian the following documents or instruments (a "Mortgage File"):

(i)        the original Mortgage Note, endorsed in blank, without recourse, or in the following form: "Pay to the order of Deutsche Bank National Trust Company, as Trustee under the applicable agreement, without recourse," with all prior and intervening endorsements showing a complete chain of endorsement from the originator to the Person so endorsing

to the Trustee, or with respect to any lost Mortgage Note, an original Lost Note Affidavit; provided however, that such substitutions of Lost Note Affidavits for original Mortgage Notes may occur only with respect to Mortgage Loans, the aggregate Cut-off Date Principal Balance of which is less than or equal to 2.00% of the Pool Balance as of the Cut-off Date;

(ii)     the original Mortgage, with evidence of recording thereon, and a copy, certified by the appropriate recording office, of the recorded power of attorney, if the Mortgage was executed pursuant to a power of attorney, with evidence of recording thereon;

(iii)     an original Assignment assigned in blank, without recourse;

(iv)     the original recorded intervening Assignment or Assignments showing a complete chain of assignment from the originator to the Person assigning the Mortgage to the Trustee as contemplated by the immediately preceding clause (iii) or the original unrecorded intervening Assignments;

(v)     the original or copies of each assumption, modification, written assurance or substitution agreement, if any; and

(vi)     the original or copy of the lender's title insurance policy or an attorney's opinion of title or similar guarantee of title acceptable to mortgage lenders generally in the jurisdiction where the Mortgaged Property is located, together with the original or copies of all endorsements or riders which were issued with or subsequent to the issuance of such policy, or in the event such original or copy of the title policy is unavailable, a written commitment or uniform binder or preliminary report of title issued by the title insurance or escrow company.

If any of the documents referred to in Sections 2.01(ii), (iii) or (iv) above has as of the Closing Date been submitted for recording but either (x) has not been returned from the applicable public recording office or (y) has been lost or such public recording office has retained the original of such document, the obligations of the Depositor to deliver such documents shall be deemed to be satisfied upon (1) delivery to the Trustee, or to the appropriate Custodian on behalf of the Trustee, of a copy of each such document certified by the applicable Originator in the case of (x) above or the applicable public recording office in the case of (y) above to be a true and complete copy of the original that was submitted for recording and (2) if such copy is certified by the applicable Originator, delivery to the Trustee, or to the appropriate Custodian on behalf of the Trustee, promptly upon receipt thereof of either the original or a copy of such document certified by the applicable public recording office to be a true and complete copy of the original. The Depositor shall deliver or cause to be delivered to the Trustee, or to the appropriate Custodian on behalf of the Trustee, promptly upon receipt thereof any other original documents constituting a part of a Mortgage File received with respect to any Mortgage Loan, including, but not limited to, any original documents evidencing an assumption or modification of any Mortgage Loan.

The Master Servicer (in its capacity as Seller) shall promptly (and in no event later than thirty (30) Business Days, subject to extension upon a mutual agreement between the Master Servicer and the Trustee, following the later of (i) the Closing Date, (ii) the date on which the Seller receives the Assignment from the Custodian and (iii) the date of receipt by the Master Servicer of the recording information for a Mortgage) submit or cause to be submitted for recording, at no expense to the Trust Fund or the Trustee, in the appropriate public office for real property records, each Assignment referred to in Sections 2.01(iii) and (iv) above and shall execute each original Assignment referred to in Section 2.01(iii) above in the following form: "Deutsche Bank National Trust Company, as Trustee under the applicable agreement." In the event that any such Assignment is lost or returned unrecorded because of a defect therein, the Master Servicer (in its capacity as Seller) shall promptly prepare or cause to be prepared a substitute Assignment or cure or cause to be cured such defect, as the case may be, and thereafter cause each such Assignment to be duly recorded.

Notwithstanding the foregoing, however, for administrative convenience and facilitation of servicing and to reduce closing costs, the Assignments shall not be required to be submitted for recording (except with respect to any Mortgage Loan located in Maryland) unless such failure to record would result in a withdrawal or a downgrading by any Rating Agency of the rating on any Class of Certificates; provided further, however, that each Assignment shall be submitted for recording by the Seller in the manner described above, at no expense to the Trust Fund or the Trustee, upon the earliest to occur of: (i) reasonable direction by Holders of Certificates entitled to at least 25% of the Voting Rights or the NIMS Insurer, (ii) failure of the Master Servicer Termination Test, (iii) the occurrence of a bankruptcy or insolvency relating to the Seller, (iv) the occurrence of a servicing transfer as described in Section 7.02 hereof and (v) if the Seller is not the Master Servicer and with respect to any one Assignment or Mortgage, the occurrence of a bankruptcy, insolvency or foreclosure relating to the Mortgagor under the related Mortgage. Notwithstanding the foregoing, if the Master Servicer is unable to pay the cost of recording the Assignments, such expense shall be paid by the Trustee and shall be reimbursable to the Trustee as an Extraordinary Trust Fund Expense.

All original documents relating to the Mortgage Loans that are not delivered to the Trustee, or to the appropriate Custodian on behalf of the Trustee, are and shall be held by or on behalf of the Seller, the Depositor or the Master Servicer, as the case may be, in trust for the benefit of the Trustee on behalf of the Certificateholders. In the event that any such original document is required pursuant to the terms of this Section to be a part of a Mortgage File, such document shall be delivered promptly to the Trustee, or to the appropriate Custodian on behalf of the Trustee. Any such original document delivered to or held by the Depositor that is not required pursuant to the terms of this Section to be a part of a Mortgage File, shall be delivered promptly to the Master Servicer.

The parties hereto understand and agree that it is not intended that any mortgage loan be included in the Trust that is a "High-Cost Home Loan" as defined by HOEPA or any other applicable predatory or abusive lending laws.

SECTION 2.02.  Acceptance of REMIC I by the Trustee.

Subject to the provisions of Section 2.01 and subject to any exceptions noted on the exception report described in the next paragraph below, the Trustee acknowledges receipt (or, with respect to Mortgage Loans subject to a Custodial Agreement, receipt by the respective Custodian as the duly appointed agent of the Trustee) of the documents referred to in Section 2.01 (other than such documents described in Section 2.01(v)) above and all interests and all other assets included in the definition of "REMIC I" under clauses (i), (iii), (iv) and (v) (to the extent of amounts deposited into the Distribution Account) and declares that it, or such Custodian as its agent, holds and shall hold such documents and the other documents delivered to it constituting a Mortgage File, and that it holds or shall hold all such assets and such other assets included in the definition of "REMIC I" in trust for the exclusive use and benefit of all present and future Certificateholders.